1
2
3
4
5
6
7
8 **UNITED STATES DISTRICT COURT**
9 **SOUTHERN DISTRICT OF CALIFORNIA**

| UNITED STATES OF AMERICA, | CASE NO. 18CR3737-WQH |
|---|---|
| Plaintiff, | ORDER |
| v. | |
| BENJAMIN CARTER (6), | |
| Defendant. | |

HAYES, Judge:

The matter before the Court is the motion to suppress fruits of illegal stop and seizure, and motion to suppress statements for *Miranda* violation filed by Defendant Benjamin Carter. (ECF No. 109).

## BACKGROUND FACTS

Beginning in November 2016, federal agents investigating a narcotics importation and distribution organization began intercepting the BlackBerry Messenger ("BBM") communications of "PELON," subsequently identified as Modesto PAYAN-Moreno. PAYAN used BBM communications to coordinate the movement of narcotics proceeds with his associates. One of PAYAN's associates was identified by the BBM screenname "BMW."

In April 2017, agents from Homeland Security Investigations ("HSI") in Calexico, CA obtained authorization to intercept BBM communication between PAYAN and BMW. The investigation revealed that BMW regularly coordinated the movement of both narcotics and proceeds with an individual known by the BBM

screenname "LA PANCHA." At the time agents applied for the June 20, 2017 wiretap, it was believed that BMW was directly involved in coordinating the transportation of narcotics (specifically, methamphetamine) and narcotics proceeds. Agents continued to investigate in order to identify additional individuals involved in narcotics trafficking.

On July 7, 2017, agents began intercepting conversations between BMW and La Pancha involving a movement of money. On July 10, 2017, BMW sent phone number 951-743-8424 to La Pancha with the name "Joan." La Pancha immediately responded "There will be some more today so they can bring down more paper. I hope some170." The agents continued to intercept conversations between BMW and La Pancha discussing the transaction.

Based on the July 10, 2017 interceptions, Calexico HSI Special Agent Ainslie contacted Torrance Police Detective Daniel Cid to request assistance in the investigations and specifically to identify the owner of the 951-743-8424 phone number. Detective Cid applied for a warrant through Los Angeles County to obtain GPS pings on the 951-743-8424 phone ("the 951 phone"). On July 10, 2017, a Magistrate Judge at the Los Angeles County Superior Court issued a warrant to obtain GPS pings on the 951 phone. Detective Cid began monitoring the GPS pings. BBM interceptions later that same day indicated that $200,000 in proceeds would be transported the following day before noon.

On July 11, 2017, at approximately 6:45 a.m., Detective Cid and his surveillance team started physical surveillance at the location of the pings for the 951 phone, an apartment complex at 10244 Arrow Route, Rancho Cucamonga, California. The goal of the surveillance team was to locate the owner of the 951 phone. While conducting surveillance Detective Cid noticed a few cars leaving the complex, including a white sedan. Shortly thereafter, Detective Cid noticed that the GPS ping for the 951phone was no longer at the apartment complex. The next ping was centered at the Golden Oak Park parking lot with a 9 meter accuracy. Detective Cid and his surveillance team went

1   to the park. There was one vehicle parked in the parking lot and a few people playing
2   soccer. Detective Cid believed that the vehicle, a white Chevrolet sedan, may have
3   been one that he saw leave the apartment complex. Detective Cid noted that the
4   location of the white Chevrolet, whose driver was later identified as the Defendant, was
5   consistent with the ping data. The surveillance team continued to followed the white
6   Chevrolet. The pings continued to correlate with the location of the white Chevrolet.

7        At approximately 7:44 a.m., Torrence Police Detective Norris, part of the
8   surveillance team, observed the white Chevrolet pull into a Chevron gas station in
9   Fontana, CA. Detective Norris was parked at a pump at the gas station when he saw
10  the white Chevrolet under surveillance alongside him on the other side of the same gas
11  pump. Detective Norris recognized the car and driver as the same vehicle and person
12  under surveillance. Detective Norris saw a silver Nissan sedan pull into the gas station
13  with a female driver and a male passenger in the front seat. Detective Norris saw
14  Defendant exit the white Chevrolet and converse with the two occupants of the silver
15  Nissan near the pumps. During the conversation, Detective Norris saw the trunk of the
16  Nissan open and then close quickly. Both occupants of the Nissan returned to their
17  vehicle empty handed and Defendant left in his vehicle. Detective Norris concluded
18  that an illicit transaction had taken place at the gas station based on his training and
19  experience as a narcotics detective and the totality of the circumstances. Detective
20  Norris communicated his observations to his team on the radio. Detectives continued
21  their surveillance of Defendant and the white Chevrolet as the vehicle exited the gas
22  station.

23       At approximately 8:13 a.m., on July 11, 2017, BBM interceptions between BMW
24  and LA PANCHA indicated that a transfer of narcotics proceeds had been successfully
25  conducted. *See* Exhibit 11 ("The money thing is done, dude. 195.").

26       Investigators continued surveillance on the white Chevrolet as it traveled to a
27  second gas station, a car wash, and eventually back to the apartment complex located
28  at 10244 Arrow Route. The pings on the 951 phone continued to correlate with the

location of the white Chevrolet. Defendant exited the Chevrolet with a backpack and box and entered one of the apartments in the building.

Agents observed a female—later identified as Patricia Clavel—drive away in the Chevrolet carrying a backpack. Detective Norris requested that California Highway Patrol (CHP) stop Clavel in the Chevrolet to see if she was the courier of narcotics proceeds. CHP Officer Bostrom conducted a stop of the Chevrolet and Clavel. During the stop of Clavel, Defendant came to the scene of the stop and made contact with a different officer at the scene. Clavel was given a ticket and left the scene. Surveillance continued on the Defendant.

Based upon the ping data and surveillance, Detective Cid was certain that Defendant was the user of the 951 number. Later in the afternoon, detectives observed Defendant exit the apartment wearing a different backpack, enter a white Nissan Versa, and depart the apartment complex. Detective Cid updated Agent Ainslie. Detective Cid asked Detective Norris to obtain a black and white patrol unit to effect a traffic stop. Detective Norris contacted CHP Officer Bostrom. Detective Norris provided Officer Bostrom with the license plate and the location of the car and "asked him to . . . come up with his own probable cause to stop the car and conduct his investigation." (ECF No. 224 at 96).

At approximately 1:50 p.m., CHP Officer Bostrom conducted a traffic stop of Defendant and the white Nissan based his observation of "speed as well as light out." *Id*. at 117. Officer Bostrom asked Defendant to get out of the vehicle and asked if there was anything illegal in the vehicle. Defendant responded that there was "an abundance of cash" and that Officer Bostrom could not search the vehicle. *Id.* at 119. Officer Bostrom deployed a canine which alerted to the vehicle and the backpack located on the front passenger seat. Officer Bostrom searched the vehicle and found a backpack containing four, clear, plastic-wrapped packages containing currency. The currency was later counted and found to contain $194,199 in United States currency.

Defendant was not arrested in order to conceal the ongoing wiretap and the larger

18cr3737WQH

investigation. Defendant disclaimed ownership of the money.  Defendant was cited and released at 3:20 p.m.  The bulk currency was seized by Detective Cid.

On August 22, 2018, a grand jury in the Southern District of California returned an Indictment charging Defendant and six co-conspirators with one count of Conspiracy to Launder Monetary Instruments in violation of Title 18, United States Code, Section 1956(h).

### CONTENTIONS OF THE PARTIES

Defendant contends that the moneys seized and statements made are fruit of an illegal stop and must be suppressed.  Defendant contends that law enforcement did not have information sufficient to believe that he was in possession of the 951 phone or involved in any criminal activity.  Defendant asserts that the 951 phone was not located in his possession at any time and that the GPS ping data did not provide probable cause to stop and search his car.  Defendant further asserts that the officer unreasonably prolonged the traffic stop and that the statements outside the vehicle were taken in violation of *Miranda.*[1]

Plaintiff United States contends that the investigators had reasonable suspicion to justify the traffic stop and probable cause to search the vehicle. Plaintiff United States asserts that the collective knowledge from the broader investigation provided reasonable suspicion for Officer Bostrom to stop Defendant's vehicle.  Plaintiff United States asserts that the investigators had reason to believe that the user of the 951 phone was engaged in money laundering and worked together to identify the user of the 951 phone.  Plaintiff United States asserts that the totality of the circumstances provided reasonable suspicion to believe that Defendant was the user of the 951 phone and involved in money laundering.  Plaintiff asserts that the automobile exception and the collective knowledge doctrine provided probable cause to search the vehicle.  Plaintiff United States further asserts that Defendant was not in custody during the investigatory stop and *Miranda* warnings were not required.

---

[1] *Miranda v. Arizona*, 374 U.S. 437, 444 (1966).

## RULING OF THE COURT

Reasonable suspicion is sufficient to support an investigatory traffic stop under the Fourth Amendment. *See United States v. Lopez-Soto*, 205 F.3d 1101, 1104-05 (9th Cir. 2000). "Reasonable suspicion 'exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion.'" *United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015) (quoting *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc)). The "*particularized* suspicion" requirement encompasses two elements. "First, the assessment must be based upon the totality of the circumstances. [] Second, the assessment must arouse a reasonable suspicion that *the particular person being stopped* has committed or is about to commit a crime." *Montero-Camargo*, 208 F.3d at 1129. The collective knowledge doctrine applies to a determination of reasonable suspicion "where an officer (or team of officers), with direct personal knowledge of *all* the facts necessary to give rise to reasonable suspicion or probable cause, directs or requests that another officer, not previously involved in the investigation, conduct a stop, search, or arrest." *United States v. Ramirez*, 473 F.3d 1026, 1033 (9th Cir. 2007).

In this case, the HSI agents and the Torrence Police Department officers were working together on a criminal investigation into the coordinated movements of narcotics and proceeds of narcotics transactions. The investigators had a particularized facts from the overall investigation to support the reasonable suspicion that the user of the phone with the number 951-743-8424 would be engaged in transporting drug proceeds on July 11, 2017. The investigators obtained a warrant to obtain and track the GPS pings on the 951 phone. The investigators conducted surveillance using the GPS pings in an effort to identify the user of the phone. The surveillance of the Defendant coordinated with the GPS pings provided a reasonable basis for the investigators to suspect that the Defendant was the user of the 951 phone. The investigators followed the Defendant throughout the day on July 11, 2017 and confirmed that the GPS pings

for the 951 phone coordinated with the Defendant's location. Detective Cid reasonably concluded based upon particularized facts that the Defendant was the user of the 951 phone.

During the surveillance, Detective Norris observed the Defendant in his vehicle meet up with two other individuals in a separate vehicle at a gas station. Officer Norris observed the Defendant in conversation with the two individuals, observed the trunk of the other vehicle open and close quickly, and observed the individuals leave quickly. Officer Norris concluded that an illicit transaction had taken place based upon the totality of the circumstances, including his knowledge of an arrangement for the user of the 951 phone to obtain and transport narcotics proceeding on that date. The investigators followed the Defendant from the gas station back to the apartment complex and observed the Defendant exit the vehicle with a backpack and a box. Agents observed a female leave the apartment complex with a backpack and requested a stop of her vehicle to determine whether she was the courier of the narcotics proceeds. CHP officers conducted a stop and found no proceeds. The investigators subsequently observed the Defendant exit the apartment complex with a backpack. The Court concludes that particularized facts known to the investigators, including the interceptions, the ping data, and the surveillance observations provided reasonable suspicion to believe that the Defendant was engaged in criminal activity.

The investigators requested that CHP Officer Bostrom locate the Defendant's vehicle and conduct a stop. The investigators had particularized facts to support the reasonable suspicion that the Defendant was transporting drug proceeds and to request the stop by CHP Officer Bostrom. The collective knowledge doctrine "allows courts to impute police officers' collective knowledge to the officer conducting a stop, search, or arrest." *United States v. Villasenor*, 608 F.3d 467, 475 (9th Cir. 2010). CHP Officer Bostrom was assisting HSI and the Torrence Police Department in the overall investigation. Officer Bostrom assisted the investigation in the stop of Clavel and continued to assist the investigators when he was given the location of the Defendant's

vehicle and asked to conduct a stop of the vehicle. While Officer Bostrom offered his observations of speed and light out to justify the stop to the Defendant, the stop was requested by the investigators in furtherance of the overall investigation based upon particularized facts that supported the reasonable suspicion that Defendant was engaged in transporting narcotics proceeds.

"Officers may conduct a warrantless search of an automobile, including containers within it, when they have probable cause to believe that the vehicle contains contraband or evidence of criminal activity." *United States v. Williams*, 846 F.3d 303, 312 (9th Cir. 2016) (citations omitted); *see California v. Acevedo*, 500 U.S. 565, 580 (1991) ("The police may search an automobile and the containers within it where they have probable cause to believe it contains contraband or evidence is contained.") Probable cause exists when, based on the totality of the circumstances, there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 213 (1983).

In this case, Officer Bostrom had reasonable suspicion to stop Defendant's vehicle in furtherance of an investigation into money laundering. At the stop, Officer Bostrom asked Defendant to get out of the vehicle and asked if there was anything illegal in the vehicle. Defendant responded that there was "an abundance of cash." (ECF No. 244 at 119). The Court concludes that there was probable cause to believe that the vehicle contained evidence of criminal activity and to conduct the search of the backpack located on the front passenger seat.

Defendant further contends that any statements made at the time of the stop and search must be suppressed on the grounds that he was in custody and *Miranda* warnings were not given. Defendant asserts that he was not free to leave the scene of the stop and officers were required to inform him of his *Miranda* rights before any questioning. Plaintiff United States contends that the totality of the circumstances would not cause a reasonable person to believe that an arrest had occurred.

"[I]n-custody determinations must be 'based on the totality of the circumstances' and are reviewed according to whether a 'reasonable person in such circumstances would conclude after brief questioning [that] he or she would not be free to leave.'" *United States v. Hayden,* 260 F.3d 1062, 1066 (9th Cir. 2001) (citing *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir.), *modified*, 830 F.2d 127 (9th Cir. 1987)). "Factors relevant to whether an accused is 'in custody' include the following: (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *Id.*

In this case, stop occurred on the side of a busy freeway visible to many passing motorists. Officer Bostrom ordered the Defendant to get out of the vehicle. Defendant was not confronted with any wrongdoing, or threatened in any manner. No weapons were drawn, and no handcuffs were applied. Defendant was not placed in a patrol car. The physical surroundings were not consistent with being placed "in custody." The stop was not unreasonably prolonged. Defendant was cited and released at the conclusion of the stop and search. The record supports the conclusion that the Defendant was not "in custody" for the purposes of *Miranda*.

IT IS HEREBY ORDERED that the motion to suppress fruits of illegal stop and seizure, and motion to suppress statements for *Miranda* violation (ECF No. 109) is denied.

DATED:  November 13, 2019

**WILLIAM Q. HAYES**
United States District Judge

18cr3737WQH